# NICHOLS v DEPARTMENT OF NATURAL RESOURCES, etc.
## Case No. 84-2945
State of Florida, Division of Administrative Hearings
September 25, 1985

### APPEARANCES OF COUNSEL

**G. Steven Pfeiffer** for petitioner.

**Andrew Grayson,** Department of Natural Resources, for respondent.

### OPINION

P. MICHAEL RUFF, Hearing Officer.

## RECOMMENDED ORDER

Pursuant to notice this cause came on for formal hearing before P. Michael Ruff, duly designated Hearing Officer of the Division of Administrative Hearings in Tallahassee, Florida on April 25, 1985.

This cause was initiated by a petition for formal administrative proceedings which was duly transmitted to the undersigned Hearing Officer for conduct of the proceeding. The petition was filed because of the Department of Natural Resources' Notice of Determination (by letter) of May 21, 1984 to the effect that the construction activities engaged in by the Petitioner, in furtherance of his construction of a beach house, were located seaward of the Coastal Construction Control Line demarcating the Department's jurisdiction and that the activities were not entitled to "grandfather status," such that a permit would be required.

The cause came on for formal hearing on April 25, 1985, in the course of which the Petitioner testified as a witness on his own behalf and called William A. Shults as an additional witness. The Respondent Department elicited the testimony of Bret Moore, an engineer in the Division of Beaches and Shores. The Petitioner presented Exhibit 1 which was admitted into evidence and Respondent's Exhibits 1 through 7 were received in evidence. The Petitioner raised an issue concerning the exact location of the Coastal Construction Control Line with respect to whether the Department truly has jurisdiction over the construction involved in this proceeding. The hearing was continued by agreement of the parties to the extent of holding the record open subsequent to April 25, 1985 in order to allow the Department an opportunity to present evidence respecting jurisdiction, with a concomitant partial waiver of the mandate of Rule 28-5.402, *Florida Administrative Code*. Subsequent to the hearing, however, the Petitioner waived its objection to the Department's assertion of jurisdiction and after the filing of the transcript and proposed findings of fact and conclusions of law, the matter became ripe for rendition of a Recommended Order.

The issue to be resolved in these proceedings concerns whether the Petitioner's construction activities on Dog Island in Franklin County, Florida, are entitled to "grandfather status" vis-a-vis the effective date of the Coastal Construction Line at issue, which became effective April 30, 19984, so that he may proceed with those activities without obtaining a permit from the Department of Natural Resources.

## FINDINGS OF FACT

The Petitioner, Dr. Jack G. Nichols, is a resident of the State of

250

Illinois. He and his parents have, for many years, owned property on Dog Island, a barrier island in Franklin County, Florida. Dr. Nichols owned Lots 107 and 108 on Dog Island, and has for many years entertained plans of building a beach house on each lo, consisting of a single-family residence for himself on Lot 108 and such a house on Lot 107 for his parents. Dr. Nichols has the habit of visiting Dog Island to inspect his property on his vacations and has done so from time to time prior to April, 1984. Over the years he conceived of the general type of house he wished to build and determined prior to April, 1984 to locate the houses landward of the then-existing Coastal Construction Control Line. Pursuant to Chapter 161, *Florida Statutes*, the Department of Natural Resources undertook to survey and delineate a new Coastal Construction Control Line for Franklin County. The location of that line is described in Rule 16B-26.14, F.A.C. and the new jurisdictional line became effective on April 30, 1984.

Dr. Nichols came to Dog Island for his vacation in April, 1984, at which time he learned for the first time that the Department of Natural Resources had adopted the new Coastal Construction Control Line. After hearing of this new jurisdiction boundary from other property owners on the island, he sought to determine how that newly defined boundary would affect his property and his plans for constructing a beach house. He observed aerial photographs depicting the Coastal Construction Control Line which would take effect April 30, 1984. He determined that the sites he had selected for the houses on his lots would be seaward of the new control line, as opposed to the pre-existing line which he had taken into account in selecting his original home site. He also learned that if the houses he envisioned were under construction upon the effective date of the new Coastal Construction Control Line then he would be able to proceed with their construction without having to obtain a permit from the Department of Natural Resources.

The Petitioner had not originally intended to construct the houses on his lots as early as April, 1984, but he became concerned that if he did not commence construction prior to the effective date of the new control line, he would not be able to place the houses at the location he had previously planned for. Thus, he took steps to retain a contractor and commence construction immediately. The Petitioner contacted Mr. William A. Shults, a contractor with experience in building in the coastal areas of Franklin County. Mr. Shults was available and able to undertake construction activities and the two parties entered into a contract calling for construction of a beach house for both lots on approximately April 20,1984. Mr. Shults immediately had necessary

**251**

engineering work accomplished, had plans drafted for the structures and retained a construction crew. He cleared sufficient area on both lots to accommodate the residence and thereafter, on April 26, obtained a building permit for the structures. Materials were delivered to the island by landing craft on April 26 and 27, 1984. Mr. Shults also had a truck equipped with an auger or drilling equipment transported to the island and placed on the job site on or before April 27, 1984.

The plans called for construction of the houses with a piling or pole foundation, so that the houses would be constructed above the specified flood levels. The poles and other materials necessary for construction of the foundation had all been delivered by April 27, 1984. The foundation lines were marked, the corner "batter boards" placed and other minor site preparation accomplished. The holes for the piling were to have been drilled on Saturday, April 28 but the truck, with the auger machine aboard, suffered a broken axle prior to its being positioned on Dr. Nichols' lots so that it was impossible to get the auger machine to the lots on April 28 or 29. Mr. Shults and his crew attempted to pull the truck to the site, but the difficulty of the terrain rendered that impossible. There was one other piece of auger equipment on the island, but its owner was engaged in construction activity with it at the time. That person agreed to bring his machine to the site on April 29 and begin augering and placing the poles for the pilings. His work became behind schedule however, and his machine was still involved in construction activity at his own site and could not be brought to Petitioner's site on that day.

Mr. Shults, upon learning that the augering machine would not be available when needed, began commencing hand-digging of the pilings with post hole diggers on April 29. This methods was a slow and laborious process because the holes had to be excavated much deeper than the length of the post hole diggers. As a result, when the hole was dug as deep as the post hole digger could reach from the surface of the ground, a hole had to be dug alongside the piling foundation hole so that a crew member could stand down in that hole and thus dig the piling hole deeper, handing the post hole diggers with each load of dirt up to another crew member on the surface to dump, who would then hand the post hole diggers back to the lower-placed crew member. This made the process of digging the foundation piling holes much slower than the use of the auger equipment. In this manner, however, Shults succeeded in digging four foundation holes on Lot 108. At that point, the augering machine arrived on the site and four piling holes were dug and the pertinent poles placed in them on Lot 107 as well.

Throughout this construction process, Mr. Shults' crew was working

252

on both foundations at one time. This allowed for less costly construction due to the efficiency of undertaking the same kind of work on two structures with the same crew at the same time. Since the two lots and construction sites adjoined each other, one crew could efficiently be used for both construction sites in an economic fashion.

On April 30, Shults' construction crew proceeded to work on the structure on Lot 108 to further secure and place foundation posts. The four pilings placed in the holes on Lot 107 the day before remained in place. The construction crew and most of its equipment, and most construction work, was proceeding on Lot 108 merely because of the order of Mr. Shults to his crew to finish placing the foundation posts on that lot first, on that day. During the morning of that day, representatives of the Department arrived on the site and advised Mr. Shults that the construction activities appeared to be illegal and seaward of the Coastal Construction Control Line. They advised him that any further activity of that type would be undertaken at his and the lot owner's risk and expense. Mr. Shults thus ceased activities on both lots for a time, but during the following week, after discussing the dispute with certain Department employees, arrived at the opinion that the owner's construction activities had achieved grandfather status and that no permit from the Department would be required. He thus undertook to finish placing the foundation pilings on both lots. All the foundation pilings were installed on both lots by the end of the second week of May, 1984.

Mr. Shults then contacted Dr. Nichols by telephone in Illnois informing him about the progress of the job, including the height of the piling. During this conversation Dr. Nichols became concerned that the pilings on Lot 107 did not project above the surface of the ground as far as he had anticipated, thus obstructing his view of the Gulf of Mexico from the beach house which would be constructed on top of the pilings. The view would be obstructed by the existing sand dune which Dr. Nichols had not wanted to disturb, hence located his house in the more landward position at issue. In order to provide the desired view of the Gulf over the intervening sand dune, Dr. Nichols instructed Mr. Shults to replace the existing pilings on Lot 107 with longer ones. Mr. Shults purchased new pilings, had them delivered to the site, removed the original poles and installed the new ones in their place in the same holes, including the four holes that were dug prior to the effective date of the Coastal Construction Control Line.

Dr. Nichols and Mr. Shults established that the original poles had been placed with the intention that they would be the permanent foundation for the house and no decision was contemplated nor made

**253**

concerning their removal and replacement with the longer poles until after the foundation was fully constructed. In any event, by its letter of May 21, 1984, advising Dr. Nichols of the alleged violation of the Coastal Construction Control Line, the Department made a "free-form" determination that the construction activities on Lot 107 before April 30, 1984, were not sufficient to confer "grandfathered" status and that the activities were illegal unless a permit was obtained. The subject petition was filed and this proceeding ensued.

It is true that Dr. Nichols' original intent was not to commence construction of the beach house as soon as he did in April, 1984 and that he only began construction at that earlier time when he learned of the impending effective date of the new Coastal Construction Control Line which would require him to obtain a permit before constructing the houses at the sites he had previously selected. However, it is equally true that Dr. Nichols' bona fide intention when he retained Mr. Shults to commence construction was to not merely clear the site and place pilings and then construct the houses at some indefinite later time, but rather to commence construction and pursue construction activities on an ongoing, uninterrupted basis through to completion of both houses on both lots. If the Department had not intervened with its letter to the effect that the Petitioner might be in violation of the Coastal Construction Control Line, construction activities on Lot 107 would have continued to completion in an uninterrupted fashion.

Prior to the effective date of the Department's Coastal Construction Control Line, the Petitioner's construction activity, involving the excavation for and placing of the foundation pilings for the residence to be on Lot 107, was undertaken and engaged in in a continuous, uninterrupted fashion. The decision to remove the original pilings and replace them with longer poles was not envisioned, intended or made prior to the completion of the entire pole foundation for the house on Lot 107 in the first or second week of May. It was only at this time, when the poles were all installed, that it was determined by the owner and Mr. Shults that the original pilings were not long enough to confer a sufficient view of the Gulf from the house to be constructed on top of them. Thus, the removal of the original pilings and the replacement of them with longer poles in the same holes the original pilings had been installed in, was not an interruption in the construction activities, but was rather the correction of a deficiency in the original materials. This replacement did not involve an alteration or modification of the design, extent and type of materials of the original foundation (except to the immaterial extent that the replacement poles were round instead of square).

254

In short, the construction activity undertaken after April 20, 1984 was a good faith effort to commence construction on the house on Lot 107 and continue it to completion in an uninterrupted fashion. The parties, Dr. Nichols and Mr. Shults, intended from the beginning to use the poles first placed in that foundation as the ultimate foundation for the structure, and did not intend merely placing those original poles, which were later removed, as a subterfuge to obtain a grandfathered status for the construction activity. The construction was landward of the Coastal Construction Control Line as its existed prior to April 30, 1984.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the subject matter of and the parties to this proceeding. Section 120.57(1), *Florida Statutes* (1983).

Pursuant to Section 161.052, et seq., *Florida Statutes*, it is necessary to obtain a permit from the Department of Natural Resources for construction related to a residence, beach house, sea wall, pier or the like which will, or any part of which will, be seaward of an established Coastal Construction Control Line. These permitting requirements do not apply, however, to structures that are under construction prior to establishment of the Coastal Construction Control Line. Section 161.053(7), *Florida Statutes*, provides:

> Provisions of this section do not apply to structures intended for shore protection purposes . . . or to structures at existing or under construction prior to the establishment of the Coastal Construction Control Line as provided herein, provided such structures may not be materially altered. . . .
>
> . . . . . . . . . . .
>
> (10) The Coastal Construction Control requirements defined in Subsection (1) do not apply to any modification, maintenance, or repair to any existing structure within the limits of the existing foundation which does not require or include any additions to, or repair or modification of, the existing foundation of that structure. . . .

The legislative purpose represented by these statutory exemptions for construction which is begun or completed prior to the effective date of the Coastal Control Line has been carried out in the Department's rules at Rule 16B-33.04(1), *Florida Administrative Code* which provides:

> Any structures under construction prior to the adoption and recor-

255

dation of a coastal construction control line in a particular county are exempt from the provisions of Section 161.053, *Florida Statutes* and this chapter, except as noted in Section 161.053(10).

The essential determination to be made in this proceeding is thus whether the structure on Lot 107 on Dog Island was in bona fide and continuous, uninterrupted construction prior to April 30, 1984, the effective date of the Coastal Construction Control Line mandated by Rule 16B-26.14, *Florida Administrative Code.*

The Department has defined the term "under construction" by rule at Rule 16B-33.02(34), *Florida Administrative Code* as follows:

Under construction is the continuing activity of excavating for or placing the foundation of any structure seaward of the established coastal construction control or set back line. Under construction does not include application for or obtaining a building permit, a site plan approval or zoning approval from the appropriate local government agency having jurisdiction over the activity, purchasing construction materials, placing such construction materials on the site, clearing the site in anticipation of construction, site surveying, or reactivating construction after substantially all construction activity has remained stopped for a period of six months or more.

The Petitioner's residence on Lot 107 was under construction prior to April 30, the effective date of the new Coastal Construction Control Line as the term "under construction" is defined in the above rule. The continuous activity of clearing the site and excavating for the pole foundation upon which the residence would be constructed had commenced prior to that date. It continued through and after that date in an uninterrupted fashion, with only the minor setback involving the requirement replacement of the original foundation pilings with longer ones. The replacement of he pilings did not constitute a modification of the existing foundation for purposes of the above statutory authority. The type and design of the foundation was not modified, the design of the structure the foundation was to support was not modified, therefore, no necessity to change the foundation existed. Rather, the replacement of the poles was merely done because the original ones, in an unforeseen manner, turned out to be too short. The replacement piling were placed in the same holes that the discarded ones had rested in and the replacement of the piling was, (although the correction of a mistake) a continuous activity related to the construction of the foundation as originally designed, rather than a modification of it.

The Respondent relies on two cases which involved "sham construction" attempts to avoid the legal effect of the Coastal Construction Control Line effective date. First of these is the so-called "Walton

256

Dunes Project" case.[1] In that case the Department denied grandfather status when a developer brought only 14 out of a planned 241 foundation pilings to a job-site before the pertinent deadline. The pilings were hurriedly jetted into the ground with high pressure water rather than driven or placed in an excavation. The 14 pilings in that situation were put in the ground before the site had even been prepared or graded, contrary to the situation at bar. After the pilings in that case were placed in the ground in an effort to obtain grandfather status as to the legal date of commencement of construction, the pilings were later removed and the job site was graded and other site preparation was conducted in an orderly, normal construction sequence after the deadline was passed. New holes were then dug and all pilings required for the foundation were brought to the site and installed. Clearly, in that case, continuous excavation for and placing of the foundation did not occur prior to the effective date of the control line. Instead the developer used a few pilings of the 241 ultimately required for the foundation to perpetrate a subterfuge designed to give the impression that construction had started before the legal deadline when, in fact, the pilings were placed before the normal construction sequences, involving grading and other site preparation and excavation had occurred. The Department determined in that case, correctly, that a normal, uninterrupted construction sequence had not been followed.

Similarly, in *Wiese v. Department of Natural Resources*, Case No. 83-1177 (Final Order entered November 10, 1983) the developers' plans called for 37 pilings to be placed in the foundation, each of which was to be 45-feet long. In that situation, only two pilings were delivered to the job-site prior to the Coastal Construction Control Line deadline, and only one of them was ever placed in the ground. Even before that single piling was placed, the developer determined that additional engineering work was required for the project. Thus, as it evolved, the single piling placed in the ground was not even used in the ultimate foundation. The only purpose for bringing the two pilings to that job site in the *Wiese* case was for the attainment of "grandfather" status. That activity was clearly not a part of a continuous construction activity designed, when commenced, to proceed in an orderly, continuous fashion to completion of the building involved. It was merely a sham effort to obtain grandfather status to avoid the legal implications of the coastal construction control line effective date.

---

[1] This was apparently a "free-form" decision by the Department as the Hearing Office has not been referred to any formal or informal proceeding, Recommended or Final Order. The agency decision is embodied in a letter attached to the Respondent's post-hearing pleading.

In the case at bar, however, all of the poles and other materials to be used in the foundation phase of construction, as well as other materials, were delivered to the job site. Clearing and excavation were undertaken and the pilings were placed in the excavated holes with the intent that they would serve as the foundation for the Petitioner's residence. Construction sequences were in normal order in that the job site was cleared of vegetation, the lines of the foundation were laid out, the corner "batter boards" were installed and then the excavation was performed and some of the pilings were placed before the April 30 deadline. After the April 30 deadline, the construction proceeded in normal fashion until all the foundation poles were in place. The activity was continuous and was part of an ongoing intent and plan by the Petitioner to complete construction of the residence in one continuous effort, commencing with the execution of the contract between Dr. Nichols and Mr. Shults on April 20,1984. The April construction commencement date was precipitated by the owner's belated knowledge that the April 30 deadline was looming close, but the construction effort was a good faith one and the intent by Dr. Nichols was to commence construction in April, 1984 and continue through to completion of the house, not merely to place pilings and other indicia of construction on the job site prior to the effective date of the new line and then allow the site to remain dormant for a time until he chose to complete the building.

Thus, in accordance with Section 161.053(7), *Florida Statutes* as well as Rule 16D-33.04(1), *Florida Administrative Code* it has been clearly established that the structure placed on Lot 107 on Dog Island in Franklin County, Florida was begun prior to April 30, 1984, the effective date of the Coastal Construction Control Line at issue, and it is not subject to the requirement after that effective date that builders of such structures obtain a permit from the Department of Natural Resources.

## RECOMMENDATION

Having considered the foregoing Findings of Fact, Conclusions of Law, the evidence of record, the candor and demeanor of the witnesses and the pleadings and arguments of the parties, it is, therefore

RECOMMENDED:

That the Department of Natural Resources enter a Final Order determining that the structure on Lot 107, Dog Island, Franklin County, Florida, is not in violation of the Department of Natural Resources' permitting authority.

DONE and ENTERED this 25th day of September, 1985, in Tallahassee, Florida.